**AVANT INCORPORATED**

**v.**

**POLAROID CORPORATION.**

**Civ. A. No. 72–3892–F.**

United States District Court,
D. Massachusetts.

June 8, 1977.

George E. Kersey, Annandale, N. J., for plaintiff.

Frederick L. McKnight, David L. Foster, Wilkie, Farr & Gallagher, New York City, for defendant.

## OPINION

FREEDMAN, District Judge.

Pursuant to an Order of this Court dated March 29, 1976, this matter was tried without a jury on June 7 and 8, 1976, on the limited issue of validity of the patent involved herein. The parties thereafter filed extensive briefs and proposed findings of fact and conclusions of law. After careful consideration of the evidence and pertinent authorities, the Court hereinafter sets forth its findings in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

This is an action brought under 28 U.S.C. § 1338 by Avant Incorporated (Avant) against Polaroid Corporation (Polaroid) alleging infringement of United States Letters Patent No. 3,679,512 (the '512 patent),[1] issued July 25, 1972 to plaintiff as the assignee of the patentee Frederick W. Macone.

Avant is a corporation existing under the laws of the Commonwealth of Massachusetts. Defendant Polaroid is a Delaware corporation having its principal corporate offices and a regular and established place of business in the Commonwealth of Massachusetts.

Polaroid denies that it has infringed the '512 patent and counterclaims, *inter alia*, for a declaratory judgment that the '512 patent is invalid, under 35 U.S.C. § 102, because of anticipation of prior use, knowledge, patenting, and sale; under 35 U.S.C. § 103, because of the obviousness of the '512 invention to a skilled mechanic presumed to know the prior art; and, under 35 U.S.C. § 112, for failing distinctly to claim and adequately to describe the subject matter of the '512 patent.

The patent in suit describes a method for fabricating a laminated data card. Essentially, the method involves two outer plastic sheets which are joined by elongated spot welds. These "welds or seals couple and maintain the outer sheets in a congruent relationship," and at the same time "act as nests to receive and properly orient the

1. The '512 patent has been reproduced in Appendix B to this opinion.

inner data card which may be inserted in a second or so." The essence of the claimed invention, therefore, is found in the features of the envelope which is created by the joining together of the two plastic sheets, and which is to be used in a manner to take advantage of its features. More specifically, as enumerated in Claim 1 of the '512 patent, the "coupling means" of the envelope maintain the outer sheets in a congruent face-to-face relationship with each other, permit wide separation of the coupled sheets, and are positioned with respect to the edges of the coupled sheets so as to permit proper location of an edge of a data-bearing sheet which has been inserted between the coupled sheets and abutted against the coupling means. Claim 1 further specifies that the method enables a data-bearing card to be inserted easily and rapidly between the outer sheets and, once inserted, to be gripped thereby, before the sheets and the data-bearing sheet are laminated together by the application of heat. Claim 2 of the patent in suit specifies that the coupling means is formed by heat sealing the outer plastic sheets together at widely separable portions so as to provide for accurate alignment of the edges of a data-bearing sheet in relation to the coupled outer sheets.

It is evident from a reading of the '512 patent that it does not claim or teach the use of the claimed method described above in relation to particular bonding machines, laminating materials, or variables of temperature, period of heat application, or pressure. Thus, in its determination of the validity of the patent, this Court is restricted to a consideration of the character of the envelope and the method of fabricating the laminated data card as described in the patent itself.

In order to save time at trial, the Court ordered that, following trial, the parties submit (1) any objections they might have to placing in evidence exhibits that had not been so admitted during trial, and (2) designations and counter-designations of deposition testimony to be included in the record of the case. In their efforts to comply with the Court's wishes, the parties filed, among other things, such objections and designations as were requested and, in doing so, also partook in a protracted written argument as to the propriety of each other's submissions. Because these objections and designations go directly to what the Court is to consider in its determination of the issues in this case, it is appropriate to deal with them now.

The Court admits as part of the record all the portions of deposition testimony that both plaintiff and defendant designated to the Court following trial. This includes all portions designated by Avant in its filing with this Court dated July 7, 1976, and all those designated by Polaroid in its filings dated June 17, 1976, and July 23, 1976.

The Court has considered all the exhibits presented at the time of trial, and the objections, if any, to their being admitted into evidence. The determination as to each of them is expressed in Appendix A to this opinion.

■ In addition to filing the above-mentioned objections and designations, Avant submitted to the Court designations for the record of various stipulations it claimed had been entered into with Polaroid prior to trial and designations of Rule 36 admissions that it claimed have been made by defendant. It is the Court's feeling that at the conclusion of the trial concerned herein, both sides rested their case, subject only to the submission of the objections, designations, and counter-designations already discussed. Had Avant wished to place into evidence such stipulations and admissions, it should have done so during the presentation of its case before it rested. Those designations are therefore disallowed.[2]

2. Because the stipulations and Rule 36 Admissions which Avant submitted have been excluded from the record, the Court does not reach a decision as to their validity. I would comment, however, that Polaroid raises serious question as to whether the pretrial stipulations Avant wished to designate were actually agreed upon and whether all the requests for admissions could be deemed admitted under the given circumstances.

The Patent Act of 1952 specifically sets forth the conditions of patentability in three sections. Codified as sections 101, 102, and 103 of Title 35, they make it clear that patentability is dependent upon three conditions: novelty, utility, and non-obviousness. Because by the nature of the language of sections 102 and 103, both involved in the instant case, a defense based upon section 103 is broader than one which relies upon section 102, it would seem appropriate to begin with a discussion of section 103.

35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

As stated by the Supreme Court in *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966),

[w]hile the ultimate question of patent validity is one of law, *A. & P. Tea Co. v. Supermarket Corp.* [340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162] at 155 [71 S.Ct. [127] at 131], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Id.* at 17, 86 S.Ct. at 694. Thus, as made clear by the above language, in a determination of patentability of the invention involved in the present case, as regards section 103, the background of that invention and the prior art in the field of data card lamination must be considered.

In the field of data card lamination, three general types of devices have served as providers of heat in the bonding process: the platen press, the roll laminator, and the chip bonder. Although the '512 patent does not concern or specifically refer to any particular type of laminator, an overview of the above devices is helpful in understanding a discussion of the types of bonding systems and envelopes that were used in the laminating field prior to the issuance of that patent. The platen press, as described at trial by Roger J. Kuhns, president of Avant, came into being around 1930. It consisted of two parallel plates which were heated and which laminated a sandwich of two sheets of thermal setting plastic and an insert by a process of heat, fusion, and cooling while under pressure. The roll laminator was apparently introduced into the trade in the mid-1950's and, according to Kuhns, proved to be more successful than the platen press because of its relative speed in laminating. This newer type of laminator also employed heat in its laminating process, but, unlike the platen press, made use of continuous rolls of plastic that were fed through the device and could at appropriate times have inserts placed between them so that, following the heating process, the type of sandwich already discussed was produced. The chip bonder, the most recent device of the three, came into use in the mid-1960's. This type of laminator was designed to receive an insert and an envelope of predetermined size (a "chip"). It achieved commercial success, due primarily to its speed in bonding relative to the earlier types of machines.

As briefly described above, in platen lamination, a data card is inserted between oversized sheets of plastic and heated in the press. Early platen laminations were produced by the use of separate sheets of plastic. The platen method was effective in producing laminated cards, but was not without its problems. Besides being slow and cumbersome, the original method of

using separate outer sheets could lead to operator error, since opposite faces of those sheets were heat sensitive adhesive and non-adhesive. If placed into the press so that the adhesive face was improperly facing away from instead of toward the insert being laminated, the finished product was not successfully laminated and the press was subjected to the messy excess flow of adhesive material. To avoid this type of error, the outer plastic sheets were eventually tacked together so that the sides with the heat sensitive adhesives always faced the proper direction. The result was a bag-like pouch into which an insert was placed prior to lamination.[3] Although these bag pouches apparently eliminated the operator error associated with the use of separate outer sheets, the platen method remained slow and the cards laminated in the platen press, depending upon their desired size and intended use, often needed to be trimmed of excess plastic.

Because the roll lamination method proved to be faster, the platen press became for the most part obsolete and was largely superseded by the roll laminator around 1960. Nevertheless, the latter type of machine, while faster than the platen press, had disadvantages common to the platen method—waste of plastic material and the frequent need for post-lamination trimming.

Another approach to data card lamination was taken in a 1964 patent application filed by Donald N. Decof. As taught by the Decof patent, U.S. Patent No. 3,388,661, a pouch of predetermined size was made with three sides closed and one side (the minor dimension edge) open. Face-to-face heat lamination was not employed. Rather, after a data card had been inserted, the fourth side of the pouch was sealed and embossed with a distinctive raised pattern which would usually identify the organization using the identification card. Thus the card, not bonded to the pouch itself, "floated" within. Briefly, the Decof patent claimed a card receptacle as described above in which the sealed area defined a pocket utilized to position an identification sheet and which served as a tamperproof, counterfeit deterrent identification device.

It was in the mid-1960's that the patent in suit was conceived and eventually reduced to practice. According to Avant, the '512 patent was the result of its efforts to create a method for producing laminated data cards that would provide security, minimize waste of plastic, reduce labor time, and eliminate costs of post lamination trimming devices.

About the same time that Avant conceived and put into practice the envelope which was the subject of the '512 patent, Polaroid began to produce an envelope named the Polapouch. That pouch had a construction similar to that of the Decof pouch. As in the method taught by the Decof pouch, a data card was placed in the Polapouch, and then a fourth edge was sealed, leaving the insert to float within. Several years later, about 1969, Polaroid produced another type of laminate envelope referred to as a dual bond. The dual bond laminate made use of pressure sensitive adhesive and was the subject of a patent filed by Robert A. McVoy and Ronald R. O'Connor in 1972 (U.S. Patent No. 3,827,726) and apparently fashioned after the teachings of a patent filed by Lyman D. Dunn in 1966 (U.S. Patent No. 3,505,140). The significance of the Dunn patent to this case will be discussed later.[4]

It was in the early 1970's that Polaroid began to produce the types of laminate envelopes that are the two accused structures in this case: the Polaseal envelope, introduced about 1971, and the Polapress envelope. The latter was the subject of U.S. Patent No. 3,495,501 filed in 1973 by

---

3. Whether there was any significance to such tack welds other than to prevent such operator error in placement of the sheets is a matter with which the parties are in disagreement. That issue will be discussed later.

4. Because the Dunn patent is referred to a number of times in this opinion, it has been reproduced in Appendix B following a reproduction of the patent in suit.

Paul A. Andrews and Richard M. Raia and assigned by them to Polaroid.

■ The starting point in consideration of any challenge to the validity of a patent is the language found in 35 U.S.C. § 282. That section, at the time of commencement of this suit, provided that "[a] patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." Although the above presumption does exist it is clear from the case law that it is by no means conclusive and can be overcome by the party asserting the invalidity. *See, e. g., Westinghouse Electric & Manufacturing Co. v. Formica Insulation Co.,* 266 U.S. 342, 348, 45 S.Ct. 117, 69 L.Ed. 316 (1924). To go one step further, it has been settled in this circuit that "[t]he presumption, at least where a combination patent claim is involved, is not a heavy one to begin with." *Futorian Manufacturing Corp. v. Dual Manufacturing & Engineering, Inc.,* 528 F.2d 941, 943 (1st Cir. 1976); *Lawrence Rigging, Inc. v. Airtek Corp.,* 182 USPQ 375 (D.Mass.1974). I believe that the patent alleged in this case to have been infringed is such a combination patent. Based on the reasoning set forth in the pertinent cases, and from a review of the evidence in this case, I find that the presumption of validity of the '512 patent is dissipated.

Looking specifically to the patent in suit, it is apparent from the record that Avant contends that that patent was not anticipated in the prior art by virtue of the fact that it claims certain distinctive elements. Those elements essentially are as follows:

(1) congruent outer plastic sheets;

(2) maintenance of congruency, which is attained by accurately positioned heat seals (coupling means);

(3) ability of the outer sheets to be widely separate ("butterflying");

(4) accurate initial registration (alignment) of an insert by positioning it against the coupling means;

(5) snapping back of outer sheets after insertion to grip the insert and prevent slipping (maintain alignment) prior to lamination;

(6) heat activated face-to-face lamination; and

(7) elimination of post-lamination trimming.

■ I find that the '512 patent is invalid under 35 U.S.C. § 103 because the subject matter of that patent when taken as a whole was obvious at the time the invention was made to a person having ordinary skill in the art to which that subject matter pertains. As I will elaborate below, I feel that the subject of the '512 patent is but a combination of elements found in the prior art. Although a patent which brings together such elements may be valid, to be so it must represent a synergy, resulting from their union. Thus, as the established test for combination patents states, "[t]he conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable." *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). *See Forbro Design Corp. v. Raytheon Co.,* 390 F.Supp. 794, 801 (D.Mass.1975), *aff'd,* 532 F.2d 758 (1st Cir. 1976). A review of the '512 patent, the prior art, and the evidence before this Court leads me to conclude that each of the elements claimed in the patent in suit was present in the prior art either independently or in combination and that their use in that patent have created nothing so new or unusual that it could be patentable. To avoid uncertainty as to how this conclusion is reached, each of those elements should be dealt with individually.

It is plain from a reading of the '512 patent that it claims the use of congruent outer plastic sheets, those sheets being held together by the coupling means (heat seals or welds). The use of the phrase "congruent face-to-face relationship" in Claim 1 of the patent is taken by this Court to mean that the outer edges of the plastic sheets coincide. The patent does not, however, place any significance on congruency. From testimony presented at trial, it appears as if Avant's assertion is that congru-

ence of the plastic sheets relates to the advantage of avoiding post-lamination trimming or die cutting. Such a relationship is nonetheless not expressed in the '512 patent. In addition, I would agree with Polaroid in its argument that avoidance of post-lamination die cutting is not the necessary and inevitable result of congruency. The significance of the congruent relationship is also left unclear when it is realized that the patent in suit does not specify tolerances relating to congruency that would be allowable in the practicing of the patent. It would seem that such tolerances would be necessary in production of the types of envelopes that are the subject of the patent in suit. In any event, the Court can find in the '512 patent no significance attached to congruency other than its possible relationship to elimination of post-lamination die cutting, which will be dealt with in more detail later in the Court's findings. Furthermore, I do not find that congruency, in and of itself, is an element unique to the method taught in the '512 patent. An examination of envelopes or pouches used with the platen press, as well as other types of envelopes in the prior art which have been presented as exhibits in this case, reveals outer sheets held together in relationships that, taking reasonable tolerances into account, can be considered congruent.

The use of heat seals or welds as a coupling means for holding together plastic sheets prior to lamination is certainly nothing new in the prior art. Indeed, there is no question that this type of coupling means was employed in the fabrication of the early platen pouches. Avant, however, argues not only that the positioning of the coupling means in the prior art was not as precise as in the envelope which is the subject of the '512 patent, but also that a significant use of these welds as taught in the '512 patent was previously unanticipated. What Avant alludes to is the use of the

seals as an abutment against which an insert can be placed so as to achieve accurate initial registration prior to lamination. A reading of the Dunn prior art patent, however, indicates that the above elements of the '512 patent were indeed already present in the prior art.[5] Dunn teaches use of . . adhesive sheets that "may have a small portion which adheres to each other . . to provide a hinge means or a means normally holding the two sheets . . . directly together." That patent goes on to specify that "the line of adhesion provides an edge . . . against which the card or sheet-like article to be laminated may be initially abutted, if desired, to facilitate initial registration thereof." It could be argued that the envelope in Dunn differs from that taught by the '512 patent in that the coupling means used in Dunn is an adhesive rather than heat seals or welds, and is a continuous edge rather than a number of tackings. Nevertheless, the important fact is that Dunn teaches the use of a hinge or coupling means along one of the four edges of an envelope against which an insert can be accurately aligned.[6]

Many of the elements which Avant asserts are unique to the '512 patent are in fact present in the types of envelopes, or half pouches, used with platen presses prior to the filing of the patent in suit. Such a half pouch, as exemplified by exhibit P2N, is an envelope of essentially congruent plastic sheets which have been joined along one of four edges by heat seals. These outer sheets may, as in the case of the type of envelope taught by the '512 patent, be widely opened ("butterflied") so that an insert may be placed between them. Such an insert can be abutted against the seals for initial registration prior to lamination. That such a practice was done on occasion in the past is reflected by the record in this case. Avant points out that the operating instructions for a platen press placed in

---

**5.** The Dunn patent application was filed April 20, 1966, and is dated April 7, 1970. The '512 patent application was filed April 19, 1967, and is dated July 25, 1972.

**6.** An examination of the diagrams found in the Dunn patent also appears to indicate a congruent relationship between the outer sheets, as well as the ability of those sheets to be widely separated to receive an insert.

evidence at trial as exhibit P2 instruct the user to locate centrally any insert within the plastic sheets, thus implying that such an insert should be kept away from the seals. However, although the seals in the platen pouches may not always have been as precisely produced as those found in the '512 patent envelopes are asserted to be, and may not have been originally intended as something against which to abut an insert, one cannot ignore the fact that the practice of using the seals as an abutment was not unknown or unpracticed. In addition, as inspection of platen pouches introduced as exhibits at trial will reveal, once an insert has been placed against the seals, the outer sheets close in a manner sufficient to grip the insert. A final characteristic of the platen envelope is that, following lamination, it can be left untrimmed, depending upon its intended use. Granted, such pouches were in the past often trimmed or die cut. But the avoidance of this post-lamination process is something not unknown to users of the platen press. The record reveals not only that there were situations in which a post-lamination platen pouch would go untrimmed, but also that it was not an uncommon practice for pouches to be pre-cut in halves or quarters to facilitate the lamination of cards of varying dimensions.

Nowhere does the '512 patent either claim or refer to the elimination of post-lamination trimming or die cutting. Although Avant apparently is arguing that the elimination of such procedures is inherent in the '512 patent, I do not find that that is the result that necessarily would follow from practicing the patent's method. In any event, this Court does not feel that the avoidance of post-lamination cutting or trimming was unknown in the prior art. As has already been mentioned, envelopes used with the platen press were at times left untrimmed or die cut after lamination, depending upon intended use or the whim of the individual for whom the laminate was produced.

Regarding the avoidance of post-lamination trimming or cutting in the prior art, I would also refer once again to the Dunn patent. The drawings found in that patent clearly depict an envelope of predetermined dimensions. A reading of Dunn reveals passages which certainly suggest the fabrication of an envelope which avoids post-lamination trimming or cutting. At one point Dunn states that "[p]eripheral positions of the finished lamination assembly may be trimmed by individual user," suggesting that the finished product need only be cut or trimmed to make it more suitable to the user's liking. More specifically, it can be argued that Dunn teaches pre-lamination cutting by the fact that it provides the following:

The lamination unit of this invention may be made in several sizes so as to fit small card-like articles, large stationery-size articles, or several other sheet sizes. Therefore, unlike the case with laminating mechanisms, the size of the sheet which may be laminated is relatively unlimited, merely based upon the sizes in which the units are made.

Thus, as reflected in the above discussion, this Court is of the opinion that the elements asserted to be unique to the '512 patent can be found in the prior art, merely by examining the Dunn patent and the pouches used with the platen press. I cannot say after consideration of the entire record that those elements have been used in the '512 patent in a new or unusual manner. I find that because the subject matter of the '512 patent was obvious to those skilled in the art when the patent was originally filed, the patent in suit herein is invalid under 35 U.S.C. § 103.

Polaroid also argues that the patent in suit is invalid under subsections (a), (b), (e), and (g) of section 102. Thus, that section reads in pertinent part:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on

sale in this country, more than one year prior to the date of the application for patent in the United States, or

\* \* \* \* \* \*

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

\* \* \* \* \* \*

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

I cannot agree with Polaroid in its argument as to section 102. While the elements of the '512 patent were already present in the art, I do not feel they are all sufficiently embodied by any single prior patent or structure, including the Dunn patent and the platen pouches. The '512 patent cannot therefore be invalidated under section 102.

Finally, Polaroid argues that the '512 patent is invalid under 35 U.S.C. § 112 in that it fails distinctly to claim and adequately to describe its subject matter. I find no merit in this assertion. The '512 patent sufficiently meets the requirements set forth in section 112.

In view of the foregoing opinion that the patent in suit is invalid under 35 U.S.C. § 103, judgment is to be entered for the defendant on the claim of infringement.

## APPENDIX A

### PLAINTIFF'S EXHIBITS

P1 Series of Exhibits (P1A through P1F)
> Excluded at time of trial

P2 Series of Exhibits
> P2—admitted into evidence
>
> P2A—received in evidence at time of trial
>
> P2B through P2L—admitted in evidence
>
> P2M and P2N—received in evidence at time of trial
>
> P2O and P2P—admitted into evidence

P3 Series of Exhibits (P3A through P3E)
> Admitted into evidence

P4—Admitted into evidence

P5 Series of Exhibits
> P5, P5A through P5C—admitted into evidence
>
> P5D and P5E—admitted into evidence. The documents which comprise these two exhibits are to be considered individually.

P6—Admitted into evidence

P7 Series of Exhibits (P7A through P7C)
> Admitted into evidence

P8 Series of Exhibits  (P8, P8A through P8K)

>Admitted into evidence

P9 Series of Exhibits  (P9A through P9C)

>P9A and P9B—received in evidence at time of trial

>P9C—admitted into evidence

P10 Series of Exhibits  (P10A through P10E)

>P10A through P10C—received in evidence at time of trial

>P10D—admitted into evidence.  The documents which comprise this exhibit are to be considered individually.

>P10E—received in evidence at time of trial for limited purpose of showing that it is a patent on improvement on the Macone invention.

P11 Series of Exhibits  (P11A through P11C)

>Received in evidence at time of trial.

P12 Series of Exhibits  (P12, P12A through P12E)

>P12, P12A through P12D—received in evidence at time of trial

>P12E—admitted into evidence.  This exhibit is a marked-up copy of the patent in suit. The notations and underscoring found thereon will be ignored by the Court and the exhibit is being admitted only for examination of the patent's content.

P13—Admitted into evidence

P14—Admitted into evidence

P15—Excluded

P15A—Excluded

### DEFENDANT'S EXHIBITS

D101 through D103—Received in evidence at time of trial.

D104—For identification only.  Not offered into evidence.

D105—Admitted into evidence.

D38  —Admitted into evidence.
D39A          "      "      "
D57A (p. 155) "      "      "
D57A (p. 167) "      "      "
D57C          "      "      "
D63           "      "      "
D59           "      "      "
D65           "      "      "
D15           "      "      "
D30           "      "      "
D69A          "      "      "

Appendix B to follow.

APPENDIX B

(PART 1)

F. W MACONE

3,679,512

LAMINATED CARD ENVELOPE

Original Filed April 19, 1967

*FREDERICK W. MACONE*
INVENTOR

BY *Robert L. Nathan*

ATTORNEY

# United States Patent Office

3,679,512
Patented July 25, 1972

3,679,512
## LAMINATED CARD ENVELOPE

Frederick W. Macone, Carlisle, Mass., assignor to Avant Corporation, Lincoln, Mass.
Original application Apr. 19, 1967, Ser. No. 632,072, now Patent No. 3,526,567.
Divided and this application May 20, 1970, Ser. No. 39,035
Int. Cl. B32b *31/20;* G09f *3/02*
U.S. Cl. 156—272                                    2 Claims

### ABSTRACT OF THE DISCLOSURE

This disclosure illustrates a novel envelope for receiving and properly orienting a data card positioned within the envelope which is thereafter subjected to heat and pressure to produce a composite, multilayered laminated card.

The present invention relates to a laminated card envelope for facilitating the manufacture of laminated cards.

### CROSS REFERENCE TO RELATED APPLICATION

This application is a division of application Ser. No. 632,072, now Pat. No. 3,526,567, filed Apr. 19, 1967, assigned to the same assignee as the present invention.

### BACKGROUND OF THE INVENTION

Laminated cards containing printed or pictorial data cards are usually produced by manually orienting the data card with respect to the inside faces of the larger outer plastic sheets which "sandwich" the data card. Generally it is desirable to manipulate the data card so that its edges are parallel to the edges of the outer plastic sheets and so that the border surrounding the data card is even or symmetrical. Often, before the composite card, bearing the centered data card, is exposed to heat and laminating pressure in the laminator the inner data card changes position to produce an unsightly card or even a ruined one where the data card extends beyond the edges of the outer plastic sheets. Additionally, a given pre-determined position of the inner card with respect to the outer plastic sheets is required if the laminated card is to be embossed or coded for automatic data processing reading equipment. The positioning of the inner data card is sometimes further impeded by a moist card (e.g., a photographic print not fully dried) sticking to the inside faces of the outer plastic cards. The envelope of the present invention is constituted so that a moist photographic print may be rapidly inserted and properly oriented without rubbing or being pressed against the inner faces of the plastic sheets which causes abrasion and consequent damaging of the moist emulsion surface. In any event, it is highly desirable, especially for rapid production, to provide means for rapidly and accurately positioning the inner data card with respect to the outer plastic cards in a manner which impedes shifting of the inner card before lamination.

### SUMMARY OF THE INVENTION

In accordance with a preferred embodiment of the invention, first and second outer plastic sheets are heat sealed or spot welded to produce a pair of nests each consisting of orthogonally positioned elongated welds, separated by an amount substantially equal to a major dimension (length or width) of the inner data card. The welds or seals couple and maintain the outer sheets in a congruent relationship, while they act as nests to receive and properly orient the inner data card which may be inserted in a second or so. Since the nests lie just outside of the corner edges of the cards, they prevent a shift in card position before lamination.

### SPECIFIC DESCRIPTION

The figure illustrates outer plastic cards 1 and 2, sealed or welded together by nests 3 and 4 each consisting of elongated, orthogonally positioned seals or welds. "L" shaped electrodes may be applied

to the congruent cards to heat seal or weld them as shown. The nests are preferably positioned just beyond the corner edges of the inner inserted data card 6 so as to "frame" the card and prevent the aforesaid shifting. The elongated welds or seals making up each nest need not actually intersect, and for that matter need not necessarily be elongated. The outer sheets may be completely separate before being coupled together by the seals or could be formed of a single double sized sheet of plastic folded along edge 7.

The folding of a double sized plastic sheet before insertion of the data card and lamination, with or without the aforesaid nests, is particularly suitable for very high mass production where the outer sheets need not be of different material. In the absence of nests and for certain applications, the fold itself acts to maintain the outer sheets in the proper relationship and may be used to orient the data card where a major dimension of the card, such as its length or width, is positioned against the fold. Also, this approach may be utilized in conjunction with a single spot weld or heat seal. In other words, the length of the card, for example, may be positioned against the fold and its width may be positioned against a single elongated or spot weld.

Obviously, many modifications and variations of the present invention are possible in the light of the above teachings. It is therefore to be understood, that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described.

I claim:

1. A method of producing a laminated data card having a plurality of edges comprising the steps of:

(A) providing an envelope having:

(1) coupling means positioned between the inner heat activatable adhesive-bearing surfaces of a pair of outer sheets to be laminated together for maintaining said outer sheets in a congruent face-to-face relationship with each other;

(2) said coupling means being positioned with respect to said pair of outer sheets for permitting wide separation of major portions of the outer coupled sheets;

(3) said coupling means being positioned with respect to the edges of said pair of outer sheets for properly locating an edge of an inner data-bearing sheet inserted between said coupled outer sheets and abutting said coupling means;

(B) separating said other sheets along at least two adjacent edges to permit an inner data-bearing sheet to be easily and rapidly inserted between said outer sheets and gripped thereby;

(C) inserting an inner data-bearing sheet between said outer sheets and against said coupling means for accurately positioning an edge of said data-bearing sheet with respect to said outer sheets; and

(D) laminating said outer sheets and said inner data-bearing sheet together by the application of heat thereto.

2. The method of claim 1 wherein said coupling means is formed by heat sealing said first and second outer sheets together at widely separated portions of said outer sheets to provide for accurate alignment of the edges of said inner data bearing sheet with respect to the coupled outer sheets.

References Cited

UNITED STATES PATENTS

| 2,006,744 | 7/1935 | Pierce | 40—2.2 |
| 2,294,796 | 9/1942 | Moulder | 156—290 X |
| 2,444,685 | 7/1948 | Waters | 156—290 |
| 2,767,756 | 10/1956 | Niles | 156—290 X |

FOREIGN PATENTS

| 1,356,311 | 2/1962 | Sweden | 156—290 |

CARL D. QUARFORTH, Primary Examiner

E. E. LEHMANN, Assistant Examiner

U.S. Cl. X.R.

40—1.5, 2.2; 156—290, 293, 306; 283—7

(PART 2)

April 7, 1970      L. D. DUNN      3,505,140

APPARATUS AND METHOD FOR LAMINATING CARD-LIKE ARTICLES

Filed April 20, 1966

Inventor:
Lyman D. Dunn

By: Hofman Wiener Allen, Stellman & McCord
Attorneys

# United States Patent Office

3,505,140
Patented Apr. 7, 1970

3,505,140
APPARATUS AND METHOD FOR LAMINATING CARD–LIKE ARTICLES
Lyman D. Dunn, C/o Marian Company, 325 W. 25th Place, Chicago, Ill. 60616
Filed Apr. 20, 1966, Ser. No. 543,843
Int. Cl. B32b 29/06, 31/16
U.S. Cl. 156—249                                                         4 Claims

## ABSTRACT OF THE DISCLOSURE

A lamination unit and method of use thereof for laminating card-like articles, the unit comprising a pair of translucent or transparent sheets on either side of a release sheet with the translucent sheets having adhesively coated faces in opposed engagement with the release sheet. The unit is intended to be used by separating one of the transparent sheets from the release sheet and adhering a card-like article to one transparent sheet, following which the release sheet is separated from the other transparent sheet and the other transparent sheet is adhered to the card-like article and any areas of the one transparent sheet beyond the card-like article to laminate the card-like article between the two sheets.

This invention relates to an improved structure and a novel method for laminating card-like articles between protective sheets.

Recently mechanisms have been developed and are being publicly used for laminating card-like articles between transparent adhesively coated sheets. Typically, these devices include means for mounting rolls of the adhesively coated transparent material and roller means through which the card-like article is fed and by means of which it is sandwiched or laminated between the oppositely fed transparent sheets. The provision of such machines does not satisfy the many needs for such laminations. For example, it is neither convenient or practical to have such a structure in the home. In addition, there are limitations as to the size of the article which may be laminated.

This invention is directed to a lamination structure and a method of using the same wherein the basic lamination unit may be manually worked upon by an individual to laminate a card-like article therein to produce a lamination similar to that obtained with laminating machines without the assistance of external mechanisms or other non-ambient conditions such as heat or the like.

It is therefore a primary object of this invention to provide a novel lamination structure for facilitating lamination of card-like articles between adhesively coated transparent sheets.

It is another object of this invention to provide a novel method for laminating a card-like article between adhesively coated transparent sheets.

Other objects, features and advantages of the present invention will be apparent from the following description of the preferred embodiments illustrated in the accompanying drawings, in which:

FIGURE 1 is a section view through the lamination unit of this invention;

FIGURE 2 is an exploded view of the lamination unit shown in FIGURE 1;

FIGURE 3 is a view showing the first stage of operation of the lamination unit as a card-like article is inserted therein, after one sheet has been separated from the center sheet of release material;

FIGURE 4 is a view of a second stage of use of the lamination unit of this invention;

FIGURE 5 shows a third stage of use;

FIGURE 6 shows the completed laminated structure resultant from using the method and lamination unit of this invention;

FIGURE 7 is a section view through the completed unit shown in FIGURE 6; and

FIGURE 8 is a top plan view of a modified form of the lamination unit of this invention.

Referring now to the drawings, the lamination unit 10 of this invention includes sheets 12 and 14 which preferably are of a transparent or substantially transparent plastic sheet material. An insert or release sheet 16 is interposed between sheets 12 and 14. It is intended that each of the transparent sheets 12 and 14 will be provided with one face, such as 12a and 14a, respectively, which will be coated with a pressure-sensitive adhesive. The unit 10 will be so assembled so that the adhesively coated faces 12a and 14a face toward each other. Sheet 16 is one commonly known as a "release sheet" having release properties relative to pressure-sensitive adhesives. Such sheets are generally coated with wax-like substances to obtain these release properties. Thus when the lamination unit 10 is assembled with adhesive faces 12a and 14a facing inwardly towards each other, the interposition of release sheet 16 provides a means by which the sheets 12 and 14 may be easily pulled away from the remainder of the lamination to expose the adhesively coated surfaces, normally protected by the remainder of the lamination.

In the preferred embodiment, the insert or release sheet 16 may be staggered relative to the sheets 12 and 14 so as to provide a projecting tab-like end to facilitate grasping and peeling back one of the adhesively coated sheets 12 or 14. Also, the adhesive sheets may have a small portion which adheres to each other at the end 17 opposite from the projection of release sheet 16 to provide a hinge means or a means normally holding the two sheets 12 and 14 directly together, even in the absence of the release sheet 16. Furthermore, the line of adhesion provides an edge 17a against which the card or sheet-like article to be laminated may be initially abutted, if desired, to facilitate initial registration thereof.

The use of this unit is illustrated in FIGURES 3 through 5. One of the adhesively coated sheets, such as sheet 12, is pulled away from the release sheet 16 exposing the adhesively coated face such as 12a. A card-like article 18 may then be juxtaposed face up on the release sheet in a position to contact the adhesively coated face 12a and be adhered thereto.

The next step is the separation of the release sheet 16 from the adhesively coated face 14a of the other transparent sheet 14. Once this is accomplished, as shown in FIGURES 4 and 5, the adhesively coated face 14a of the other sheet 14 is exposed and sheet 14 may be brought into facial juxtaposition with card-like article 18 and sheet 12 to laminate the card therebetween. The finished lamination assembly 20, shown in FIGURES 6 and 7, includes the card-like article which may be completely enclosed within the confines of sheets 12 and 14 and permanently secured therebetween by the adhesive engagement of the adhesively coated faces 12a and 14a which adhere to both faces of the card, as well as to each other in the peripheral areas surrounding the card. Peripheral portions of the finished lamination assembly 20 may be trimmed by the individual user.

It is to be noted that to facilitate in initial registration of the card 18, grid lines 22 (shown in FIGURE 3) may be printed or otherwise formed on release sheet 16 or on one of the adhesive sheets. For decorative purposes, one of the sheets, either 12 or 14, may be given a slight coloration which could provide a decorative border to the card-like article 18 enclosed between the sheets. Also, one of the sheets 12 and 14 could be made of a greater thickness or provided with a greater stiffness than the other sheet in which case, the information bearing face of the card-like article 18 would be positioned to show through the thinner sheet and the reverse side of the card would be substantially obscured by the thicker or stiffer sheet.

FIGURE 8 shows a modified lamination unit 10 including a top sheet 112 similar to sheet 12 and a bottom sheet (not shown) similar to sheet 14. These sheets of unit 112 are adhered to each other along a hinge-like edge 117. Release sheet 116 protrudes exteriorly from one side of unit 110 generally transversely to hinge 117 as opposed to the parallel protrusion of release sheet 16 relative to hinge 17 of unit 10. Release sheet 116 could also protrude outwardly from the side opposite hinge 117 in addition to the lateral protrusion shown.

The lamination unit 10 of this invention may be made in several basic sizes so as to fit small card-like articles, large stationery-size articles, or several other sheet sizes. Therefore, unlike the case with laminating mechanisms, the size of the sheet which may be laminated is relatively unlimited, merely based upon the sizes in which the units 10 are made. Furthermore, these units 10 may be easily and compactly stored in the home or for office use to which the laminating mechanisms are not generally suitably adapted. The original formation of the unit with the adhesive faces in opposed juxtaposition relative to each other means that the non-adhesively coated faces form a self-protecting

outer envelope for the unit. This, in combination with the trim, flat configuration of the unit, enhances the storage of these items.

The foregoing detailed description has been given for clearness of understanding only, and no unnecessary limitations should be understood therefrom, as some modifications may be obvious to those skilled in the art.

I claim:

1. A lamination unit for use in manually laminating card-like articles, comprising: a first sheet having an adhesively coated face; a second sheet having releasably coated opposed faces, one of said releasably coated faces being releasably adhered to the adhesive coated face of the first sheet; and a third sheet having an adhesively coated face releasably adhered to the other releasably coated face of said second sheet, said first, second and third sheets being in superposed relation to each other, respectively, and having portions which extend beyond said second sheet and are adhered to each other to provide a hinge means for retaining the first and third sheets together during use whereby, one of said first and third sheets may be separated from said second sheet and a card-like article adhered to the adhesive face thereof, following which the second sheet may be separated from the other of said first and third sheets and the said other of the sheets adhered to the card-like article to laminate the same between the first and third sheets.

2. The lamination unit of claim 1 wherein one of said sheets has grid line means thereon for facilitating registration of a card-like article during lamination thereof.

3. The method of laminating a card-like article between substantially transparent sheets comprising the steps of: providing a card-like article and providing a lamination unit having substantially transparent sheets, each of which have one adhesively coated face releasably adhered to an interposed release sheet in opposition to each other; separating one of the transparent sheets from the release sheet and adhering the card-like article to the adhesive face of said one of the transparent sheets; separating the other of the transparent sheets from the release sheet; and juxtaposing the adhesive face of the other transparent sheet into adhesive contact with the card-like article and into adhesive contact with the adhesive face of the one transparent sheet in areas beyond the card-like article.

4. The method of laminating the card-like article between substantially transparent sheets comprising the steps of: providing a card-like article and providing a lamination unit having substantially transparent sheets, each of which have one adhesively coated face releasably adhered to an interposed release sheet in opposition to each other; separating one of the transparent sheets from the release sheet, emplacing the card-like article on the release sheet and then placing the separated one transparent sheet into adhesive engagement with the card-like article; subsequently separating the other of the transparent sheets from the release sheet and juxtaposing the adhesive face of the other transparent sheet into adhesive contact with the card-like article in the adhesive face of the one transparent sheet in areas beyond the card-like article.

References Cited

UNITED STATES PATENTS

| 2,139,377 | 12/1938 | Mull et al. | 161—406 X |
| 2,283,026 | 5/1942 | Yates | 161—406 X |
| 2,788,041 | 4/1957 | Carver | 156—289 X |
| 3,069,793 | 12/1962 | Francescon | 40—22 |
| 3,159,516 | 12/1964 | Harris | 156—247 X |

JOHN T. GOULKASIAN, Primary Examiner

J. D. SMITH, Assistant Examiner

U.S. Cl. X.R.

40—2.2; 156—289; 161—40, 406