AVANT, INCORPORATED,
Plaintiff, Appellant,

v.

POLAROID CORPORATION,
Defendant, Appellee.

No. 77–1349.

United States Court of Appeals,
First Circuit.

Argued Nov. 11, 1977.

Decided March 21, 1978.

George E. Kersey, Lincoln, Mass., for appellant.

David L. Foster, New York City, with whom Frederick L. McKnight, Willkie, Farr & Gallagher, New York City, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, GORDON, District Judge.*

LEVIN H. CAMPBELL, Circuit Judge.

Avant Incorporated sued Polaroid Corporation for infringement of patent No. 3,679,512 (the '512 patent) issued to Avant as assignee of the inventor. The patent disclosed an allegedly novel plastic envelope which, after the insertion of a data card, is to be subjected to heat and pressure in order to produce a laminated data card. The district court found for Polaroid on the latter's counterclaim which asserted that the patent was invalid for obviousness under 35 U.S.C. § 103. *Avant Inc. v. Polaroid Corp.*, 441 F.Supp. 898 (D.Mass.1977). Avant appeals.

The patented envelope is composed of two plastic sheets joined by elongated spot welds or heat seals. In the words of the application, these "welds or seals couple and maintain the outer sheets in a congruent relationship," and at the same time "act as nests to receive and properly orient the inner data card which may be inserted in a

* Of the Eastern District of Wisconsin, sitting by designation.

second or so."[1] The outer sheets of clear plastic thus form a sandwich which, upon insertion of the card to be laminated and application of correct amounts of heat and pressure, fuse so as to produce a laminated card.[2]

 It is important to note, as did the district court, that while the envelope must be used in conjunction with a machine capable of providing the requisite heat and pressure, and while successful lamination requires the plastic sheets to possess certain properties so as to fuse properly, the '512 patent does not claim or teach anything about molding machines, laminating materials, temperature variables, period of heat application, or pressure. The patent dwells upon the design of the envelope, emphasizing its ability to align and secure the data card and to avoid disturbing the moist surface of an inserted photograph.

Not surprising, the district court found the '512 patent invalid for obviousness under 35 U.S.C. § 103. While not precisely replicated in a single prior patent, and hence not in violation of 35 U.S.C. § 102, the patent was clearly foreshadowed by the prior art, in particular by so-called platen pouches and by the Dunn patent. Platen pouches have been widely used for lamination. They consist of two conjoined, roughly congruent plastic sheets that are designed to receive a data card and are thereafter laminated by heat. While the platen pouch and related molding process are less sophisticated than the patented envelope and its related process, both envelopes involve a very similar basic concept. The Dunn patent disclosed a plastic envelope and taught, as the district court found, "the use of a hinge or coupling means along one of the four edges of an envelope against which an insert can be accurately aligned." Dunn also indicated, in its diagram, a congruent relationship between the outer sheets, as well as the ability of those sheets to be widely separated to receive an insert. For these and for other reasons developed in the opinion below, we agree with the district court that a person skilled in the relevant art would have had little difficulty in arriving at an envelope of this nature.[3]

Perhaps because it recognizes that if the '512 patent is taken at face value—as in essence the description of an envelope for lamination containing certain useful but not remarkable features—a finding of obviousness is unavoidable, Avant argues that the patent actually discloses an entire "method" of laminated card manufacture. Hence the cryptic mention of a "congruent" relationship is said to reveal a means to prevent "ooze of the adhesive from between the

1. Claim 1 of the patent is framed as "a method of producing a laminated data card having a plurality of edges," the steps in which comprise, first of all, providing an envelope having a coupling means for maintaining the outer sheets in a "congruent face-to-face relationship with each other." The coupling means is to be positioned so as to permit "wide separation" of the sheets, and to permit proper location of an edge of the insert abutting the coupling means. Claim 1 goes on to state that the claimed method separates the outer sheets along at least two outer edges to permit a data sheet "to be easily and rapidly inserted between said outer sheets and gripped thereby." The patented method is said further to comprise the steps of "inserting an inner data bearing sheet between said outer sheets and against said coupling means for accurately positioning an edge of said data-bearing sheet with respect to said outer sheets," and, finally, to laminate the outer sheets and inner data bearing sheet "by the application of heat thereto." Claim 2 is of the "method of claim 1 wherein said coupling means is formed by heat sealing said first and second outer sheets together at widely separated positions of said outer sheets to provide for accurate alignment of the edges of said inner data bearing sheet."

The emphasis throughout the patent is upon the ability of the described envelope to receive and maintain the data card in the correct position, without shifting. There is no hint that the invention teaches a lamination method eliminating post-molding ooze or wavy edges.

2. Fusion is accomplished by the melting of the inner side of each plastic sheet. The outer portion is designed to withstand the heat. The patent does not describe the composition or chemistry of the two plastic sheets; lamination by heat utilizing these principles was well known prior to the patent.

3. Avant urges us to recognize that the greatest inventions may be simple. We so concede, but this gets us nowhere: many nonpatentable devices are simple also.

sheets of plastic and thus avoids the irregular edge distortion that invariably occurred in the prior art. . . ." We are told that since laminating techniques prior to use of this envelope involved pouches with excess material on the edges that had to be trimmed after molding, this patent teaches, in essence, a new process of lamination whereby a card is inserted in an already shaped envelope which requires no cutting of trimming afterwards.

But we cannot see that it was some novel teaching in the '512 patent that made it possible to trim first and mold later. Avant's own version of the inventive history leads to the opposite conclusion. If earlier laminating techniques resulted in ooze and wavy edges, it obviously made no sense to trim and finish the pouch prior to molding so long as the molding process itself was bound to distort the edges. But once the molding art improved so as to eliminate such problems, utilization of a pre-cut envelope such as the patent describes became a perfectly obvious possibility. Improvements in the molding art did occur. The platen press was replaced with the chip bonder, and envelopes can now be heated and bonded without distortion. These key developments may or may not have involved patentable invention, but once they took place invention was not required to finish off the pouch earlier rather than later.

Avant argues that by requiring "congruency" the patent did, in effect, teach an advance in molding technique and hence reached the level of invention. Congruency is said to have produced a "surprising" result, in that the molten plastic did not ooze but, for reasons not fully understood, stayed put. Thus, although the patent says not a word to connect congruency with an improvement in the molding art, we are asked to find the word "congruent" the key to the invention—which is thus transformed into an invention of a heat-molding technique, rather than of simply a convenient laminating envelope.

There are two answers to this contention. First, while congruency of the two sheets may be one of the conditions necessary to mold even edges, it was not established that anyone would ever have thought otherwise. Envelopes and folders are quite often congruent. Second, the teaching of congruency, without more, does not disclose the "invention" of how to mold so as to avoid disfigured edges. Other matters— the right combination of heat, materials and machine—are clearly of equal or greater significance to achieve that result; and about such matters the patent teaches nothing. There was, indeed, evidence that the patented envelope will ooze, and did ooze, unless the correct combinations of heat and molding materials are used. While an inventor need not understand all the principles and benefits of his invention, he must make "such disclosure and description of his invention that it may be put into practice." *Diamond Rubber Co. v. Consol. Tire Co.,* 220 U.S. 428, 436, 31 S.Ct. 444, 448, 55 L.Ed. 527 (1910); *Rosen v. Lawson-Hemphill, Inc.,* 549 F.2d 205, 211 n.5 (1st Cir. 1976). Even if we assume the '512 patent refers to a technique for heat-molding rather than simply an efficient envelope with certain useful features for the reception and alignment of a card, it does not adequately disclose and describe the invention.[4] Not only does the patent fail to reveal all the necessary steps, it does not even spell out the degree of congruency—the tolerances—required to achieve the effect now claimed. The conclusion is inescapable that the patent is only what it appears to be—a design for a particular kind of envelope to be used in the lamination process, and as such, void for obviousness.

Avant also relies on the "sign-posts" of commercial success and acceptance as establishing invention. However, Avant has not shown that the envelope described in the '512 patent was the key to the suc-

---

4. The district court's finding that the patent distinctly claimed and adequately described its subject matter, as required under 35 U.S.C. § 112, was grounded on what the court understood its subject matter to be—essentially, the design of an efficient envelope, not a technique for heat molding resulting in undistorted edges and corners.

cess and acceptance which the chip bonding lamination technique employed by Avant, and now by others, has enjoyed. Central to such success has been a bonding machine and molding process making it possible to utilize an envelope of the type set forth in the '512 patent in an efficient manner. Avant cannot bootstrap this success to the use of the envelope made out in the patent, any more than it can claim the chip bonding technique is covered by the patent itself. In the '512 patent we can find nothing more than an efficiently designed but unremarkable envelope which was not shown to have been, by itself, the linchpin of Avant's commercial success.

Avant complains that the district court erroneously excluded certain responses by Polaroid to requests for admission, but the record indicates that exclusion was due to Avant's procedural default and consequent waiver of its rights to have the admissions admitted into evidence.

We have carefully considered Avant's other arguments in its brief and reply brief, and find them to be without merit.

*Affirmed.*